# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OREGON HEALTH & SCIENCE UNIVERSITY, | |
| *Plaintiff*, | |
| *v.* | |
| CAROLE JOHNSON, in her official capacity as Administrator, Health Resources and Services Administration, | Case Number 1:24-cv-02184-RC |
| and | |
| XAVIER BECERRA, in his official capacity as Secretary, United States Department of Health and Human Services, | |
| *Defendants*. | |

**BRIEF OF JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC. AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Jeffrey L. Handwerker
Samuel I. Ferenc
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
Tel.: +1 202.942.5000
Fax: +1 202.942.5999
jeffrey.handwerker@arnoldporter.com

*Attorneys for Amicus Curiae Johnson & Johnson Health Care Systems Inc.*

## LCvR 26.1 CORPORATE DISCLOSURE

Certificate required by LCvR 26.1 of the Local Rules of the United States District Court for the District of Columbia:

I, the undersigned, counsel of record for Johnson & Johnson Health Care Systems Inc., certify that to the best of my knowledge and belief, Johnson & Johnson, a publicly held company, is the ultimate parent company of Johnson & Johnson Health Care Systems Inc. No other publicly held corporation owns 10% or more of the stock of Johnson & Johnson Health Care Systems Inc.

These representations are made in order that judges of this Court may determine the need for recusal.

/s/ Jeffrey L. Handwerker
Jeffrey L. Handwerker

Counsel of Record for Johnson & Johnson
Health Care Systems Inc.

# TABLE OF CONTENTS

LCvR 26.1 CORPORATE DISCLOSURE ........................................................................ i

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION AND INTEREST OF AMICUS CURIAE ........................................... 1

BACKGROUND ............................................................................................................... 2

     A.      Statutory and Regulatory Background ........................................................ 2

          1.     The 340B Program ........................................................................ 2

          2.     Audits of Covered Entities ........................................................... 5

     B.      Procedural Background ............................................................................... 8

ARGUMENT ..................................................................................................................... 9

     A.      J&J Attempts in Good Faith to Resolve Concerns About OHSU's Utilization .... 10

     B.      J&J's Efforts to Address Potential Issues with OHSU's 340B Purchasing Have Complied With the 1996 Guidelines and the 340B Statute .......................... 13

CONCLUSION ................................................................................................................. 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Astra USA, Inc. v. Santa Clara Cnty.*,
    563 U.S. 110 (2011)...........................................................................................................2

*Bellion Spirits, LLC v. United States*,
    7 F.4th 1201 (D.C. Cir. 2021)........................................................................................9

*Holistic Candlers & Consumers Ass'n v. FDA*,
    664 F.3d 940 (D.C. Cir. 2012).....................................................................................10

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024)...................................................................................................8

*MediNatura, Inc. v. FDA*,
    998 F.3d 931 (D.C. Cir. 2021).....................................................................................10

*Novartis Pharms. Corp. v. Johnson*,
    102 F.4th 452 (D.C. Cir. 2024)........................................................................3, 4, 5, 8

*PhRMA v. HHS*,
    138 F. Supp. 3d 31 (D.D.C. 2015)................................................................................8

*PhRMA v. HHS*,
    43 F. Supp. 3d 28 (D.D.C. 2014)..................................................................................8

*Sanofi Aventis U.S. LLC v. HHS*,
    58 F.4th 696 (3d Cir. 2023) ..........................................................................................3

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944)......................................................................................................8

*Soundboard Ass'n v. FTC*,
    888 F.3d 1261 (D.C. Cir. 2018)....................................................................................9

*W. Minn. Mun. Power Agency v. FERC*,
    806 F.3d 588 (D.C. Cir. 2015)......................................................................................8

**Statutes**

42 U.S.C.

§ 256b(a)(4) ........................................................................................................2, 6

§ 256b(a)(5)(A) .........................................................................................................4

§ 256b(a)(5)(B) .........................................................................................................5

§ 256b(a)(5)(C) ................................................................................2, 5, 6, 7, 12, 14

§ 256b(d)(2)(B)(v)(I) ................................................................................................5

**Regulations**

61 Fed. Reg. 65,406 (Dec. 12, 1996) .......................................................6, 7, 12, 13

**Legislative Materials**

H.R. Rep. No. 102-384, pt. 2 (1992) ....................................................................3, 4

**Other Authorities**

HRSA, *2023 340B Covered Entity Purchases*, https://bit.ly/3Yktlsj ...........................4

Rory Martin *et al.*, IQVIA, *Unintended Consequences: How the Affordable Care Act Helped Grow the 340B Program* (Aug. 30, 2024), https://bit.ly/3XFDWh8 .....................3

Rory Martin & Harish Karne, IQVIA, *The 340B Drug Discount Program Grew to $124B in 2023* (May 10, 2024), https://bit.ly/4itVTZr ..................................................4

U.S. Gov't Accountability Off., GAO-20-212, *340B Drug Discount Program: Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement* (Jan. 27, 2020), https://bit.ly/3ZG0ctH ................................................4

## INTRODUCTION AND INTEREST OF AMICUS CURIAE[1]

*Amicus Curiae* Johnson & Johnson Health Care Systems ("J&J") has been a proud participant in the 340B Program for more than three decades. J&J is committed to the original purpose of the 340B Program as Congress established it in 1992: helping uninsured and indigent patients gain greater access to reduced-cost medications. But more than three decades later, the 340B Program is being regularly abused by entities it was never intended to benefit. Over time, the program has strayed far from its original aim and transformed into the second-largest federal drug program in the United States, smaller only than Medicare. Instead of supporting uninsured or indigent patients, it now primarily benefits sophisticated, well-resourced hospital systems and major for-profit retail pharmacy chains and their affiliated pharmacy benefit managers. A lack of transparency has also subjected the program to rampant abuse, to the detriment of patients.

In recent years, J&J has observed concerning trends in the volume of purchases of its drugs at 340B prices. In April 2024, J&J contacted several covered entities that J&J's data showed had significantly increased their 340B purchasing of J&J products over the preceding 12 months. J&J attempted to engage these entities in good-faith discussions so that J&J could better understand the drivers of their substantial increases in utilization and ensure that the increases did not result in duplicate discounts or diversion. Unfortunately, most entities offered little substantive response to J&J. That includes the plaintiff in this action, Oregon Health & Science University ("OHSU"), which declined J&J's requests to meet in good faith about its utilization. J&J therefore sought approval to initiate an audit of OHSU, which HRSA provided after J&J made revisions to its audit

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than *amicus curiae*, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

plan that HRSA requested.  Yet instead of cooperating with the audit—as the 340B statute requires it to do, 42 U.S.C. § 256b(a)(5)(C)—OHSU filed this case against HRSA.

J&J agrees with the government, based on the facts alleged, that this action is not ripe; that HRSA's approval of J&J's audit request does not consummate a legal determination that alters OHSU's substantive rights and obligations, and thus is distinct from the types of agency decisions that qualify as final agency action; and that J&J fully complied with HRSA guidance in initiating its audit of OHSU, although J&J maintains that aspects of HRSA's guidance are not authorized by the 340B statute.  *See generally* ECF No. 18.  J&J respectfully submits this brief as *amicus curiae* to set forth its legal position with respect to the statutory audit provisions and to highlight that OHSU's complaint presents an incomplete account of J&J's engagement with OHSU in the leadup to J&J's audit request to HRSA.  In particular, OHSU inaccurately alleges that J&J never answered a letter to which J&J in fact sent a detailed response.  J&J appreciates having the opportunity to correct the record and to underscore that it complied fully with the 340B statute throughout the audit process.

## BACKGROUND

### A.    Statutory and Regulatory Background

#### 1.    The 340B Program

Section 340B of the Public Health Service Act establishes a federal program that "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities," known as covered entities, that provide healthcare to certain underserved populations. *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011).  The statute defines "covered entity" to include 15 carefully drawn and narrow categories of healthcare providers, including distinct parts of specified types of hospitals and recipients of certain federal grants.  42 U.S.C. § 256b(a)(4)(A)-(O).  Among these categories of healthcare providers are disproportionate share

hospitals ("DSH"), which is the category in which OHSU falls.  Although DSH hospitals by definition serve a number of low-income patients, they are typically large, sophisticated hospital systems that can generate billions of dollars in revenue, employ thousands or tens of thousands of people, and utilize complex data systems, including for billing.

Over time, covered entities have realized that they could take advantage of the 340B Program to generate "revenue from serving insured patients: they turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount."  *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699 (3d Cir. 2023).  In other words, covered entities benefit from the spread between a 340B drug's acquisition cost (*i.e.*, the discounted 340B price) and negotiated rate at which insurance companies reimburse for the product (*i.e.*, a commercial rate likely approximate to the undiscounted list price).  *See Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 457 (D.C. Cir. 2024) (noting covered entities generate revenue from the "spread between the discounted price and the higher insurance reimbursement rate").

As a result, what was intended as a buy-low/sell-low program for vulnerable patients has turned into a buy-low/sell-high commercial business opportunity disconnected from its public health mission.  This is the opposite of how charity care should be funded: The 340B Program creates incentives to provide services to *insured* patients rather than those vulnerable populations most in need of affordable care.  *See*, *e.g.*, Rory Martin *et al.*, IQVIA, *Unintended Consequences: How the Affordable Care Act Helped Grow the 340B Program* 5 (Aug. 30, 2024), https://bit.ly/3XFDWh8.  In part because of these incentives, the 340B Program has grown dramatically in size over the last several years, especially with respect to DSH covered entities. When the program was established, there were about 90 DSH entities nationwide, *see* H.R. Rep. No. 102-384, pt. 2, at 13 (1992); now there are nearly 1,200.  DSH covered entities make up less

than 10% of all covered entities, but their purchases of 340B-priced drugs totaled nearly $51.9 *billion* in 2023, accounting for more than 78% of all purchases by covered entities.  HRSA, *2023 340B Covered Entity Purchases*, https://bit.ly/3Yktlsj (last updated Oct. 2024).  The list price value of 340B drugs purchased in 2023 was an astronomical $124.1 billion.  Rory Martin & Harish Karne, IQVIA, *The 340B Drug Discount Program Grew to $124B in 2023* (May 10, 2024), https://bit.ly/4itVTZr.

The 340B Program has also changed considerably over time.  340B covered entities have entered into thousands of so-called "contract pharmacy" arrangements, under which covered entities "contract with outside pharmacies" for the distribution of 340B-priced drugs.  *Novartis Pharms. Corp.*, 102 F.4th at 455.  Contract pharmacy arrangements allow covered entities, for-profit pharmacies, and pharmacy benefit managers to share the spread between the reduced 340B price and patients' higher insurance reimbursement rate.  *Id.* at 457.  Use of these "contract pharmacies" has exploded over time; between 2010 and 2019, the number of contract pharmacies dispensing 340B drugs ballooned from 1,300 to 23,000.  U.S. Gov't Accountability Off., GAO-20-212, *340B Drug Discount Program: Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement* 2 (Jan. 27, 2020), https://bit.ly/3ZG0ctH.

In enacting Section 340B, Congress sought to balance its goal of increasing patient access against the need to "assure the integrity of the drug price limitation program," which was a concern even for the much smaller program that Congress envisioned in 1992.  H.R. Rep. No. 102-384, pt. 2, at 16.  To that end, the 340B statute contains certain program integrity requirements that covered entities must follow as a condition of their eligibility to participate in the program.  First, covered entities may not obtain 340B pricing on units of drugs that are also subject to the payment of a rebate under Medicaid (known as a "duplicate discount").  42 U.S.C. § 256b(a)(5)(A).  Second,

covered entities may not "resell or otherwise transfer" 340B drugs to a person who is not a patient of the covered entity (known as "diversion"). *Id.* § 256b(a)(5)(B). A covered entity that "knowingly and intentionally" engages in diversion must pay monetary penalties. *Id.* § 256b(d)(2)(B)(v)(I).

Concerns about program abuse have been heightened by the development of so-called "replenishment models," under which covered entities and their pharmacies make an initial purchase of a product at its (non-reduced) commercial price, dispense the product to an individual who is later determined to be a patient of the 340B entity, and then receive a replacement unit at 340B-discounted prices to "replenish" the pharmacy's stock. *See Novartis Pharms.*, 102 F.4th at 457. The determination "whether individual prescriptions were eligible for the [340B] discount" may not happen for weeks or months after the product is dispensed, creating significant risk of distribution of 340B-priced drugs to ineligible patients—*i.e.*, unlawful diversion—and other potential abuse. *Id.* at 457-58. The dramatic growth in the size of the 340B Program over the last several years, as well as the extensive use of replenishment systems, only reinforces the need for strong safeguards to maintain program integrity.

### 2.    *Audits of Covered Entities*

The 340B statute authorizes HRSA and manufacturers to conduct audits of covered entities' compliance with the diversion and duplicate discounting prohibitions:

> A covered entity *shall permit the Secretary and the manufacturer* of a covered outpatient drug that is subject to an agreement under this subsection with the entity (acting in accordance with procedures established by the Secretary relating to the number, duration, and scope of audits) to audit at the Secretary's or the manufacturer's expense the records of the entity that directly pertain to the entity's compliance with the requirements described in subparagraphs (A) or (B) with respect to drugs of the manufacturer.

*Id.* § 256b(a)(5)(C) (emphasis added). As the text makes clear, manufacturers have a statutory right to conduct audits, subject only to "procedures" relating to their "number, duration, and

scope." Covered entities, in turn, have a duty to cooperate with such audits. In fact, Congress confirmed the seriousness of that obligation by making compliance with audits a condition of a covered entity's eligibility for the 340B Program. *Id.*; *id.* § 256b(a)(4). Therefore, a covered entity's failure to comply with an audit is grounds for its termination from the 340B Program. *See* ECF No. 16-5 (HRSA letter to OHSU confirming that failure to permit an audit would violate the conditions of 340B eligibility).

In 1996, HRSA published a Federal Register notice titled "Manufacturer Audit Guidelines and Dispute Resolution Process," which remains in effect. 61 Fed. Reg. 65,406 (Dec. 12, 1996). The 1996 audit guidelines include certain provisions applying the statutory text that allows HRSA to establish procedures relating to the number, duration, and scope of manufacturer audits. For example, per the guidelines, HRSA allows only one audit of a covered entity at a time; manufacturers may access only covered entity records "that directly pertain to the potential 340B violation(s)" at issue; and audits "normally" must be limited to one year. *Id.* at 65,409-10. At the completion of an audit, the manufacturer's auditors "must prepare an audit report," which the manufacturer must submit to the covered entity, HRSA, and the HHS Office of Inspector General ("HHS-OIG"). *Id.* at 65,410.

The 1996 guidelines also set out procedural and substantive directives on subjects that go well beyond the number, duration, and scope of audits. Among other things, the guidelines assert that a manufacturer may conduct an audit "only when it has documentation which indicates that there is reasonable cause," meaning that "a reasonable person could believe that a covered entity may have violated" the duplicate discount or diversion prohibitions. *Id.* at 65,409. In other words, the guidelines require that the manufacturer have grounds for suspecting non-compliance before it initiates an audit, which may include "[s]ignificant changes in quantities of specific drugs ordered

by a covered entity." *Id.* at 65,406.  The guidelines direct manufacturers to present their reasonable cause to HRSA, along with an "audit work plan."  *Id.* at 65,410.  The guidelines also direct manufacturers to contact the covered entity in writing and attempt to resolve the matter in good faith for 30 days before submitting a work plan.  *Id.* at 65,408, 65,410.  If the manufacturer proceeds with submitting a plan to HRSA, HRSA will review the plan and "work with the manufacturer to incorporate mutually agreed-upon revisions."  *Id.* at 65,410.  If HRSA finds that a manufacturer's reasonable cause showing is sufficient, and its work plan is satisfactory, HRSA "will not intervene" in an audit as long as it is conducted by "an independent public accountant" and not internal manufacturer personnel.  *Id.* at 65,409-10.

Notably, the 340B statute does not authorize any of these guideline requirements.  Nothing in the statute requires a manufacturer to have "reasonable cause" to believe that a covered entity may have violated the duplicate discount or diversion prohibitions, to confer with the covered entity before submitting an audit plan to HRSA, or to hire an independent auditing firm at its own significant expense.  *See id.* at 65,409-10.  In fact, the statute by its text places no audit-related burdens on manufacturers at all besides covering the audit expenses; instead, it grants manufacturers an unconditional right to audit a covered entity's records relating to its compliance with the duplicate discounting and diversion prohibitions, subject solely to HRSA procedures regarding the "number," "scope," and "duration" of audits.  42 U.S.C. § 256b(a)(5)(C).  The only *duty* the audit provision imposes is on *covered entities*, who "*shall permit* the Secretary and the manufacturer of a covered outpatient drug … to audit at the Secretary's or the manufacturer's expense the records of the entity" that pertain to the entity's compliance with the duplicate discounting and diversion prohibitions.  *Id.* (emphasis added).

By requiring "reasonable cause," the use of a certified independent auditor, and conferral with the covered entity before a manufacturer may proceed with an audit (none of which relates to the "number" or "scope" or "duration" of an audit), HRSA's 1996 guidelines exceed the agency's delegated authority under the 340B statute, which this Court has previously observed is narrowly circumscribed. *See PhRMA v. HHS*, 43 F. Supp. 3d 28, 42-43 (D.D.C. 2014) (*PhRMA I*); *PhRMA v. HHS*, 138 F. Supp. 3d 31, 36 (D.D.C. 2015) (*PhRMA II*); *see also, e.g.*, *W. Minn. Mun. Power Agency v. FERC*, 806 F.3d 588, 593 (D.C. Cir. 2015) ("[a]gencies are empowered to make policy only insofar as Congress expressly or impliedly delegates that power"). Because HHS generally "lacks rulemaking authority over the section 340B program," as this Court held in *PhRMA I* and *PhRMA II* and the D.C. Circuit recently reaffirmed, *Novartis Pharms. Corp.*, 102 F.4th at 456, HRSA's interpretations of the statute that fall outside its expressly delegated authority are not binding, and are relevant "only to the extent [they have] the 'power to persuade,'" *id.* at 459 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2267 (2024). Nonetheless, despite their non-binding nature, J&J followed the audit guidelines here, as the government has confirmed. *See* Defs.' Mot. to Dismiss and Mem. in Supp. at 13-14, ECF No. 18.

**B.    Procedural Background**

Plaintiff OHSU filed this suit on July 24, 2024, alleging that HRSA unlawfully authorized J&J to audit OHSU despite J&J's alleged non-compliance with the 1996 guidelines in initiating the audit. *See generally* Compl., ECF No. 1. The complaint seeks an order vacating HRSA's decision to approve J&J's audit request, as well as a declaration that the 1996 audit guidelines are binding and mandatory for both HRSA and manufacturers. *See id.* at 18. After OHSU completed service, the Court granted two motions by the government for extensions of time to respond. *See* ECF Nos. 10, 15. On November 22, 2024, OHSU filed a motion for a temporary restraining order

seeking to bar HRSA from terminating OHSU as a covered entity for not complying with J&J's audit. ECF No. 16. On November 27, however, the parties jointly moved to withdraw the motion in light of HRSA's agreement to make the effective date of any termination no earlier than January 1, 2025 and to provide OHSU with thirty days' advance notice. *See* ECF No. 17. The government then filed its motion to dismiss on December 3, pursuant to the extensions the Court granted. ECF No. 18.

## ARGUMENT

As the government's motion explains, *see* ECF No. 18 at 13-14, J&J complied with HRSA's 1996 guidelines in commencing its audit of OHSU. J&J agrees with the government's assessment on that issue, as well as its arguments that, based on the facts alleged, this action is unripe and challenges a non-final agency action. Indeed, unlike other factual circumstances where courts have found actions final, HRSA's approval of the audit does not alter OHSU's substantive rights and obligations or conclusively determine that OHSU violated the 340B statute. To the contrary, the HRSA approval here simply allows J&J to begin an audit, which could potentially uncover a statutory violation or, on the other hand, may well determine that OHSU complied with its statutory obligations. In either case, the audit will conclude with a report that J&J will provide to HRSA and HHS-OIG to consider at their discretion. It is therefore unlike agency actions that are deemed final, which consummate an agency's decision on a statutory interpretation question and alter the rights or obligations of the aggrieved party in declaring whether a violation exists (or would exist) if the party proceeds with a certain contrary interpretation of the law. *Compare, e.g.*, *Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1208 (D.C. Cir. 2021) (finding final an agency ruling letter that "put[] forth the agency's official position about how [the relevant statutory and regulatory regime] appl[ied] to the facts" of the case), *with Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1268 (D.C. Cir. 2018) (finding non-final an informal opinion letter by FTC staff that was

not "the conclusive view of the Commission" about a statute's applicability to the plaintiff's conduct); *see also MediNatura, Inc. v. FDA*, 998 F.3d 931, 940 (D.C. Cir. 2021) (finding an FDA warning letter not final where "pursuant to its own procedures," FDA "'made clear' that it would consider further evidence … before taking any final … action" (quoting *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 946 (D.C. Cir. 2012))).

J&J submits this additional brief instead to confirm its compliance with both the 1996 audit guidelines and the 340B statute and to correct the incomplete factual account presented in OHSU's complaint, which risks creating misimpressions about J&J's actions in the leadup to the challenged audit approval. This brief first describes J&J's communications and interactions with OHSU, which are critical to understanding the inaccuracies in OHSU's complaint. The brief then explains how J&J complied with not only the 1996 guidelines but also the 340B statute in initiating the challenged audit.

### A.    J&J Attempts in Good Faith to Resolve Concerns About OHSU's Utilization

J&J first contacted OHSU about its 340B utilization via email on April 22, 2024, as OHSU's complaint alleges. *See* Compl. ¶ 52. The email stated that J&J was "reaching out to request time to discuss your Covered Entity's 340B program" and explained that J&J would "[s]pecifically … like to discuss and ask questions regarding your entity's 340B utilization." *See* Compl. Ex. 1 at 1, ECF No. 1-1. Contrary to OHSU's description in the complaint (¶ 52), the email was signed "340B J&J Health Care Systems Team." ECF No. 1-1 at 1. It also copied three individual J&J personnel, including Lauren Paluzzi, J&J's Senior Director for Contracting Strategy and Operations. *See id.* On April 24, an OHSU representative, Jennifer Zanon, responded to the email proposing times for a discussion. *See id.* Ms. Paluzzi sent an Outlook calendar invitation to Ms. Zanon for a May 3 phone call. *See id.* at 2. However, on May 1, 2024, Ms. Zanon responded, declining the invitation and stating that the proposed meeting time she had

offered would no longer work and that she would "be in touch later this week or next week at the latest." *See id.* at 2. Ms. Paluzzi responded the same day thanking Ms. Zanon and stating that she would reschedule when Ms. Zanon provided her availability for the following week. *See id.*

After a week passed, J&J followed up with Ms. Zanon on May 8 and requested OHSU's availability to reschedule the meeting. *See id.* at 3. OHSU did not respond. J&J followed up again on May 15 and requested OHSU's availability, specifically stating that J&J wished to have "a good faith discussion on the growth in your entity's 340B utilization." *Id.* This time Ms. Zanon replied that J&J "should be receiving a response … very soon" from Joe Ness, OHSU Senior Vice President and COO for Healthcare. *Id.* at 4. The following day, May 16, J&J received a letter from an iCloud email address that was signed by Mr. Ness and stated that OHSU needed "additional information regarding the basis for [J&J's] inquiry." *Id.* at 5. The letter acknowledged that "340B Covered Entities must cooperate with drug manufacturer audits authorized by HRSA" and "must act in good faith when evaluating 340B compliance." *Id.* The letter also asked that J&J "submit all 340B information requests to the e-mail address listed in our current Good Faith Standards document," an OHSU policy that was attached to the letter. *See id.* at 6-7. The email address identified in the document was the address J&J had been using to communicate with Ms. Zanon, zanon@ohsu.edu. *See id.* at 7.

On May 21, 2024, Ms. Paluzzi sent a detailed response letter to Ms. Zanon at the email address specified in the Good Faith Standards document, copying the iCloud address from which Mr. Ness's May 16 letter was sent. As requested in the May 16 letter, Ms. Paluzzi's response explained in detail the basis for J&J's inquiry to OHSU—*i.e.*, that J&J had observed "substantial -- indeed over 70% -- growth in OHSU's 340B utilization over the last six months, driven primarily by STELARA® utilization." The letter noted that HRSA's 1996 guidelines "specifically

contemplate that such utilization trends are an appropriate basis for an audit," and explained that "J&J is entitled to understand the drivers of growth in [OHSU's] 340B utilization." The letter also detailed J&J's efforts to engage with OHSU in good faith up to that point, including in J&J's initial April 22 email and May 1 and May 8 follow-up messages. The letter requested that OHSU inform J&J whether it would consider participating in a call. J&J never received a response to its letter.

On May 31, 2024, ten days after sending its May 21 letter to OHSU, J&J submitted its "reasonable cause" letter to HRSA, explaining the basis for its belief that OHSU was not complying with the statute's program integrity provisions, and seeking to conduct an audit of OHSU. *See* 61 Fed. Reg. at 65,409. J&J attached an audit work plan to its letter, which included a data request list that set forth the information that J&J's independent audit firm wanted to collect from OHSU as part of their audit work. On June 13, 2024, HRSA responded, asking J&J to make certain changes to its work plan. J&J did so, and resubmitted its work plan, which HRSA approved on June 19, 2024.

J&J's independent auditor notified OHSU of the audit on June 20, 2024 and sought to proceed with gathering initial information and taking steps towards performing a standard audit. *See* Compl. Exs. 2-3, ECF Nos. 1-2, 1-3. In an effort to demonstrate its good faith, J&J offered to produce materials requested by OHSU supporting reasonable cause for the audit if OHSU agreed to maintain the confidentiality of the materials. *See* Compl. Exs. 4-5, ECF Nos. 1-4, 1-5. OHSU declined the proposal and refused to cooperate with J&J's audit, in violation of its statutory obligation to participate in HRSA-approved audits. 42 U.S.C. § 256b(a)(5)(C). Instead, OHSU chose to file suit against HRSA seeking to invalidate its audit approval.

J&J notes that OHSU's complaint in this action makes no mention of J&J's May 21 letter, which was duly sent by email from Ms. Paluzzi to both the iCloud account from which Mr. Ness's

May 16 letter was sent and to Ms. Zanon's email address, as required by OHSU's Good Faith Standards policy.  Instead, the complaint incorrectly alleges that "J&J never responded to Mr. Ness's letter."  Compl. ¶ 56.

### B.    J&J's Efforts to Address Potential Issues with OHSU's 340B Purchasing Have Complied With the 1996 Guidelines and the 340B Statute

As the government's motion to dismiss correctly notes (at 13-14), J&J's communications with OHSU have been fully compliant with the 1996 guidelines.  J&J's initial April 22, 2024 email requested time to discuss OHSU's "340B program," and "[s]pecifically … to discuss and ask questions regarding your entity's 340B utilization."  ECF No. 1-1 at 1.  J&J's May 15 email further stated that J&J wished to have "a good faith discussion on the growth in your entity's 340B utilization."  *Id.* at 3.  These statements satisfy the notice provisions of the 1996 guidelines, which as the government explains (at 13) do not direct any specific form or content for pre-audit notices to covered entities.  61 Fed. Reg. at 65,410.  J&J's correspondence plainly made OHSU aware that J&J suspected possible compliance issues and sought to resolve that matter in good faith, as the guidelines direct.  *See id.*

Indeed, OHSU's own May 16 letter confirms that OHSU understood J&J was inquiring about OHSU's compliance and was contemplating an audit.  Were OHSU not anticipating an audit, there would have been no reason for it to raise the 1996 guidelines or the audit provisions of the 340B statute in its May 16 letter—yet the letter described both in detail.  *See* ECF No. 1-1 at 5-6. To the extent OHSU genuinely sought to better understand J&J's concerns, it could have accepted J&J's repeated requests for a meeting, or reviewed and responded to J&J's May 21 letter.  The 1996 guidelines, however, require nothing more from J&J than the steps it took, as the government's brief correctly explains and OHSU's May 16 letter demonstrates.  No magic words

are needed to place a covered entity on notice of a potential audit in the manner that the guidelines direct.

Nor do the audit provisions of the 340B statute require anything further. *See* 42 U.S.C. § 256b(a)(5)(C). As noted *supra*, the audit guidelines stretch well beyond the statutory requirements. Therefore, contrary to OHSU's contention, the guidelines are non-binding. And the 340B statute places no burden on a manufacturer pursuing an audit other than that it must comply with HRSA procedures concerning the number, scope, and duration of audits and cover the audit expenses. In fact, the statute does not require HRSA approval before a manufacturer may commence an audit. The statute does not require manufacturers to use an independent certified auditor. And the statute certainly does not require manufacturers to demonstrate "reasonable cause" or to confer with the covered entity for 30 days before moving forward with an audit.[2] What Congress *did* say in the statute, expressly and unequivocally, is that covered entities "*must cooperate* with drug manufacturer audits," as OHSU's May 16 letter conceded. ECF 1-1 at 5 (emphasis added); *see also* 42 U.S.C. § 256b(a)(5)(C) ("A covered entity *shall permit* the Secretary and the manufacturer of a covered outpatient drug … to audit [its] records" (emphasis added)). The only non-compliance with binding requirements in this case, then, is OHSU's refusal to follow Congress's mandate that it comply with J&J's audit.

At bottom, this action is an unfounded and unripe attempt to interfere with a properly predicated and duly authorized audit. The Court should reject OHSU's attempt to invent statutory and regulatory obligations for J&J and HRSA in order to evade its own, especially when the effort is premised on a demonstrably incomplete account of the relevant facts.

---

[2] As noted *supra*, J&J nevertheless satisfied each of these conditions from the 1996 guidelines before initiating its audit of OHSU.

## CONCLUSION

For the foregoing reasons, J&J respectfully urges the Court to grant Defendants' motion to dismiss.

Dated: December 12, 2024

By: */s/ Jeffrey L. Handwerker*
Jeffrey L. Handwerker (D.C. Bar 451913)
Samuel I. Ferenc (D.C. Bar 1616595)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel.: +1 202.942.5000
Fax: +1 202.942.5999
jeffrey.handwerker@arnoldporter.com

*Attorneys for Amicus Curiae Johnson & Johnson Health Care Systems Inc.*