**.UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| OREGON HEALTH & SCIENCE UNIVERSITY,   ) | |
|       ) | |
|     *Plaintiff*,   ) | |
|       ) | |
|   v.   ) | |
|       ) | Civil Action No.: 24-02184-RC |
| CAROLE JOHNSON, in her official capacity as   ) | |
| Administrator, Health Resources and Services   ) | |
| Administration,   ) | |
|       ) | |
| and   ) | **ORAL ARGUMENT** |
|       ) | **REQUESTED** |
| XAVIER BECERRA, in his official capacity as   ) | |
| Secretary, United States Department of Health and   ) | |
| Human Services,   ) | |
|       ) | |
|     *Defendants*.   ) | |
|       ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION**
**TO DISMISS AND MEMORANDUM IN SUPPORT THEREOF**

Plaintiff Oregon Health & Science University (OHSU), by and through its attorneys, Hall, Render, Killian, Heath & Lyman, P.C., submits this response in opposition to the motion to dismiss filed by Defendant Carole Johnson in her official capacity as Administrator of the Health Resources and Services Administration (HRSA). ECF No. 18. Because HRSA's decision to approve an audit of OHSU, in contravention of its own regulations, was a final agency action, it is ripe for judicial review. Therefore, Defendant's motion lacks merit, and the Court should deny it in its entirety.[1]

---

[1] Xavier Becerra, in his official capacity as Secretary of the United States Department of Health and Human Services (HHS), is a named defendant in this action. ECF No. 1. Yet it does not appear that Mr. Becerra and HHS have joined Carole Johnson's motion, despite the plural "Defendants" in the title. *See generally* ECF No. 18. Thus, even if the Court were to grant Defendant's motion, this action would remain pending against Mr. Becerra and HHS.

TABLE OF CONTENTS

I.    Introduction ................................................................................................................. 1

II.    Background ................................................................................................................. 3

    A.    OHSU and the 340B Program ................................................................................. 3

    B.    J&J did not provide notice nor attempt in good faith to resolve any alleged duplicate discount or diversion violations committed by OHSU, yet HRSA approved J&J's audit request in contravention of the Manufacturer Audit Guidelines ................................. 5

    C.    HRSA's actions during the pendency of this litigation ....................................... 6

III.    Legal standards ......................................................................................................... 7

    A.    Federal Rules of Civil Procedure Rule 12(b)(1) and 12(b)(6) ............................ 7

IV.    Argument .................................................................................................................. 8

    A.    HRSA's decision to permit J&J to audit Children's National is a final agency action subject to review ......................................................................................................... 8

        1.    HRSA's approval of the audit was a definitive position ................................. 8

        2.    HRSA's audit approval effectively determined "rights or obligations" and caused "legal consequences" for OHSU ................................................................. 10

        3.    HRSA's arguments to the contrary are unavailing ........................................ 11

        4.    The HIPAA Privacy Rule further demonstrates that HRSA's audit approval is a final agency action that has legal consequences for OHSU ................................. 14

    B.    Even if HRSA's approval of the audit is not a final agency decision, it is ripe for review because OHSU will be immediately harmed and will suffer legal consequences as a result of HRSA's failure to follow its Guidelines ................................................. 15

    C.    J&J did not follow the Manufacturer Audit Guidelines before HRSA approved its audit, contrary to HRSA's misguided arguments ..................................................... 20

        1.    HRSA's Manufacturer Audit Guidelines are binding, which HRSA does not contest ................................................................................................................. 20

        2.    HRSA approved J&J's audit despite J&J failing to provide notice and failing to engage in a 30-day good faith period to resolve any issues with OHSU ................. 20

V.    The Court should ignore J&J's amicus brief, because OHSU has clarified its communications with J&J through this brief, and the government has already presented J&J's legal position ..................................................................................................... 24

VI.    Conclusion ............................................................................................................. 28

TABLE OF AUTHORITIES

CASES

*A.L. Labs., Inc. v. E.P.A.*, 674 F. Supp. 894 (1987) ................................................................19

*Abbott Labs v. Gardner*, 387 U.S. 136 (1967) ................................................ 8, 15-16, 19

*Bellion Spirits, LLC v. United States*, 7 F.4th 1201 (2021) .........................................26

*Benefitalign, LLC v. Ctrs. for Medicare & Medicaid Servs.*,
    No. 1-24-cv-02494 (D.D.C. Sept. 30, 2024) ................................................................14

*Bennett v. Spear*, 520 U.S. 154 (1997) ...........................................................................8, 15

*Bimini Superfast Operations, LLC v. Winkowski*, 994 F. Supp. 2d 106 (2014) ........ 9-10

*Ciba-Geigy Corp. v. U.S.E.P.A.*, 801 F.2d 430 (1986) ............................... 8-9, 11, 17, 18

*Ciralsky v. CIA*, 355 F.3d 661 (2004) .................................................................................7

*City of Dania Beach v. F.A.A.*, 485 F.3d 1181 (2007) .......................................................9

*Consolidated Rail Corp v. U.S.*, 896 F.2d 574 (1990) ...................................................19

*Cont'l Air Lines, Inc. v. C.A.B.*, 522 F.2d 107 (1974) (en banc) ..............................16, 19

*Cont'l Res., Inc. v. Gould*, 410 F. Supp. 3d 30 (2019) ....................................................24

*Council on Am.-Islamic Relations v. Gaubatz*, 667 F. Supp. 2d 67 (2009) ...................11

*F.L. v. Thompson*, 293 F. Supp. 86 (2003) ....................................................................19

*Federal Trade Comm'n v. Sysco Corp.*, 83 F. Supp. 3d 1 (2015) ................................12

*Genesis Healthcare, Inc. v. Becerra*, 39 F.4th 253 (2022) ..........................................13

*Global Tower Assets, LLC v. Town of Rome*, 810 F.3d 77 (2016) ................................16

*Hall v. Sebelius*, 689 F. Supp. 2d 10 (2009) ....................................................................7

*Hearth, Patio and Barbecue Assoc. v. EPA*, 11 F.4th 791 (2021) ...............................18

*Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192 (2010) .................................11

*HRI, Inc. v. E.P.A.*, 198 F.3d 1224 (2000) ......................................................................19

*In re: Independent Serv. Orgs. Antitrust Litig.*, 162 F.R.D. 355 (1995) .......................12

*Johnson & Johnson Health Care Sys., Inc. v. Becerra*,
    No. 1:24-cv-03188 (D.D.C. November 12, 2024) ......................................................11

*Khadr v. U.S.*, 529 F.3d 1112 (2008) ................................................................................7

*Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020) ......................................................................................................20

*Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F. Supp. 2d 42 (2010) ..........................23

*Macharia v. U.S.*, 334 F.3d 61 (2003) ..............................................................................7

*Maryland Dep't of Human Res. v. Sullivan*, 738 F. Supp. 555 (1990) ..........................18

*Massachusetts Mfg. Extension P'ship v. Locke*, 723 F. Supp. 2d 27 (2010) .................14

*Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67 (2001) ...................................11

*National Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
    440 F.3d 459 (2006) ......................................................................................................19

*Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (2024) .........................................26

*Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419 (2018) ...............................11

*Sanofi-Aventis U.S., LLC v. H.H.S.*, 570 F. Supp. 3d 129 (2021) .................................9

*Seminole Nation of Oklahoma v. Norton*, 223 F. Supp. 2d, 122 (2002) ......................19

*Sheridan Corp v. U.S.*, 95 Fed. Cl. 141 (2010) ..............................................................18

*Sound Association v. FTC*, 888 F.3d 1261 (2018) .........................................................27

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) ................................13

*Unity08 v. F.E.C.*, 596 F.3d 861 (2010) .........................................................................16

**STATUTES**

5 U.S.C. § 702 ................................................................................................................ 2

5 U.S.C. § 704 ............................................................................................................. 2, 8

5 U.S.C. § 706 ................................................................................................................ 8

42 U.S.C. § 1396r-8 ....................................................................................................... 4

42 U.S.C. § 256b ....................................................................................................... 4, 25

44 U.S.C. 1507 ............................................................................................................. 20

45 C.F.R. § 164.512(a)(1) ............................................................................................ 15

45 C.F.R. § 164.506(c) ................................................................................................. 15

F.R.C.P. 8(a) .................................................................................................................. 7

**OTHER AUTHORITIES**

59 Fed. Reg. 30,021 (June 10, 1994) ........................................................................... 20

61 Fed. Reg. 65,406 (Dec. 12, 1996) ..................................................................... passim

## I.    Introduction

Through its Complaint, Plaintiff Oregon Health & Science University (OHSU) has challenged the legality of the final agency decision by the Health Resources & Services Administration (HRSA) to authorize Johnson & Johnson (J&J), a manufacturer that participates in the drug pricing program authorized under Section 340B of the Public Health Service Act (the 340B Program), to audit OHSU's confidential business records. ECF No. 1 at ¶ 1. HRSA is an agency within the U.S. Department of Health and Human Services (HHS).

Under the 340B Program, OHSU is a safety net provider called a covered entity that is permitted to purchase outpatient drugs at discounted prices. These discounts are necessary, because as safety net providers, covered entities like OHSU provide medical services to a disproportionate share of indigent and low-income individuals. The 340B Program permits drug manufacturers to audit covered entities, but only to investigate potential violations of the 340B Statute involving duplicate discounts or diversion, as explained below. And before a drug manufacturer may initiate an audit, per HRSA's written procedures approved by the Secretary, the manufacturer must first notify the covered entity in writing of the alleged duplicate discount or diversion violations it is investigating and attempt to resolve any issues over the course of thirty days.

In this case, J&J never provided written notice to OHSU of any potential duplicate discount or diversion violations, and it correspondingly never engaged in a thirty-day period to attempt to resolve any perceived violations. Yet HRSA approved J&J's audit request, ignoring its own procedures in contravention of the 340B Program statute. In doing so, HRSA approved an audit whose scope likely extends well beyond investigating issues of duplicate discounts or diversion. Notably, though, OHSU does not yet know the full scope of the audit, because J&J did not provide

the requisite written notice or subsequently negotiate with OHSU, and HRSA has not yet provided the administrative record in this case.

In its motion to dismiss, HRSA makes three arguments. The first argument is influenced by the second argument, so OHSU will start by addressing whether HRSA's approval of J&J's audit is a final agency action that is subject to court review under the Administrative Procedure Act (APA), 5 U.S.C. § 704. Because HRSA's decision to approve J&J's audit, without following its own agency guidelines, was the consummation of the decision-making process and imposes legal consequences on OHSU, it is a final agency action that is subject to judicial review.

Next, HRSA claims this controversy is not ripe for determination because worse things than an audit could befall OHSU at a later time. But OHSU has no interest in suffering ***any*** harm from an improperly initiated and overly broad audit, and the APA does not require that it do so. *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action … is entitled to judicial review thereof."). If OHSU has to comply with J&J's sham audit, the harm to OHSU begins immediately and not months down the road as a result of speculative agency enforcement actions or alternative dispute matters with J&J as posited by HRSA.

By way of example and not limitation, OHSU will have to spend time and money addressing audit requests that are likely to be irrelevant to questions of duplicate discounts or diversion. Indeed, it already has as evidenced by this legal action intended to ensure that the manner in which the manufacturer audit is approved is in fact consistent with what is authorized by the 340B Program statute. Moreover, only after capitulating to this specious audit and providing confidential business information to J&J and its third party auditor that would not be protected once disclosed will OHSU, in HRSA's own words, "have the opportunity to respond to and contest [any agency] findings from the audit" or oppose J&J in an administrative dispute resolution action.

ECF 18 at 7. To put it bluntly, HRSA wants OHSU to divulge patients' protected health information and its confidential business records, subject itself to an audit of unknown scope, and then find itself potentially fighting HRSA, J&J, or both before HRSA would consider the issue "ripe" for court intervention. That exceedingly high threshold is contrary to the APA and controlling law, and issues can be ripe for judicial review even if the relevant agency action is not "final." This is particularly true when the issue is purely legal in nature, such as the case here, where HRSA did not follow its own guidelines before approving an audit.

Finally, in a Hail Mary, halfhearted argument, HRSA submits that J&J's threadbare email statements to OHSU that preceded J&J's audit request, in which it vaguely requested to have "a good faith discussion" about "340B utilization" and "growth," somehow constituted the requisite "notice" of duplicate discount violations or diversion violations to OHSU, or that the statements began the thirty day negotiation period after which an audit workplan may be submitted to HRSA for review and possible approval. In taking this position, HRSA claims the guidelines that it wrote do "not mandate that the notice have a specific form or contain specific content." ECF No. 18 at 13. But this disingenuous argument ignores the express language of HRSA's Manufacturer Audit Guidelines, the purpose of the audit procedures as stated by the 340B statute and HRSA's own comments in the Federal Register, and the common meaning of the word "notice."

Simply put, there is no merit to HRSA's arguments, and the Court should deny Defendant Carole Johnson's motion.

## II.    Background

### A.    OHSU and the 340B Program

OHSU is an Oregon statutory public corporation with its principal place of business in Portland, Oregon. ECF No. 1, ¶ 29. OHSU operates Oregon Health & Science University Hospital

(OHSU Hospital), which is a 400-bed acute care hospital that trains more than 500 medical residents and fellows each year. *Id.* OHSU Hospital has participated in the 340B Program since 1993. *Id.* Without the cost savings that the 340B Program provides, OHSU would instantly face millions of dollars in additional costs per month, which would require it to eliminate programs and staff.

Congress created the 340B Program in 1992 to permit covered entities, all of which are safety net providers, to purchase certain drugs at the same discounted rate that state Medicaid programs pay. *Id.* at ¶¶ 32–33; *see also* 42 U.S.C. § 256b(a)(1) & § 256b(a)(4); 42 U.S.C. § 1396r-8. However, the 340B statute expressly prohibits covered entities from attempting to obtain duplicate discounts or from selling outpatient drugs to people who are not patients of the covered entity (*i.e.*, diversion). 42 U.S.C. § 256b(a)(5)(A) & (B). Accordingly, Congress granted drug manufacturers the ability to conduct audits of covered entities acting in accordance with procedures established by HRSA on behalf of the Secretary to evaluate covered entities' compliance with the requirements not to facilitate duplicate discounts or engage in diversion. *Id.* at § 256b(a)(5)(C).

HRSA set forth those procedures at 61 Fed. Reg. 65,406 *et seq.* (Dec. 12, 1996) (hereinafter "Manufacturer Audit Guidelines" or "Guidelines"). The Manufacturer Audit Guidelines require a manufacturer to provide written notice to a covered entity of potential duplicate discount or diversion violations that the manufacturer believes the covered entity has committed. *Id.* at 65,410; *see also id.* at 65,406 ("The manufacturer shall notify the covered entity in writing when it believes the covered entity has violated provisions of section 340B[;]" and "[t]hese audits must pertain directly to the entity's compliance with the prohibitions against drug diversion and the generation of duplicate drug rebates and discounts with respect to drugs of the manufacturer."). This written

notice triggers a mandatory thirty-day period for the parties to "attempt in good faith to resolve the matter." *Id* at 65,410. If the good faith attempt fails, only then may the manufacturer inform HRSA of its intent to audit the covered entity. *Id.* The manufacturer may initiate an audit by submitting to HRSA an audit work plan, a "reasonable cause" statement, and supporting documentation. *Id.* Then, "[t]he Department will review the documentation submitted to determine if reasonable cause exists. If the Department finds that there is reasonable cause to believe that a violation of section 340B(a)(5) (A) or (B) has occurred, the Department will not intervene." *Id.*

  **B.**  **J&J did not provide notice nor attempt in good faith to resolve any alleged duplicate discount or diversion violations committed by OHSU, yet HRSA approved J&J's audit request in contravention of the Manufacturer Audit Guidelines**

  On April 22, 2024, J&J requested a meeting with OHSU purportedly to "discuss and ask questions regarding [its] entity's 340B utilization." ECF No. 1-1 at 1. OHSU set a meeting for May 3, 2024, but the meeting was subsequently cancelled because one of J&J's necessary attendees was unavailable at that time. *Id*. at 2–3. On May 16, 2024, OHSU's Chief Operating Officer Joe Ness sent J&J a letter requesting, among other things, additional information about the basis of the inquiry. *Id*. at 5–8. At the time OHSU filed its complaint in this case, it was under the impression that J&J never responded to this letter. ECF No. 1 at 10. However, OHSU is now aware that J&J sent a response to OHSU on May 21, 2024. *See* Ex. 1, Email from L. Paluzzi to J. Ness dated May 21, 2024.[2]

  In the communications that preceded May 21, 2024, J&J did not disclose that it was seeking to audit OHSU's 340B program, nor did J&J provide notice of alleged potential violations

---

[2] When OHSU sent its May 16 letter to J&J, it was sent inadvertently via a personal e-mail account; when J&J responded on May 21, 2024, it responded to that personal account, which is not checked regularly. *See* Ex. 1. OHSU submits this information not to fault J&J, but to explain why OHSU believed it had not received a response to its May 16 letter.

involving duplicate discounts or diversion. *See generally* ECF No. 1-1. For example, it took J&J more than a month to even use the words "diversion" or "duplicate discount"—or any variations of those words—in its communications with OHSU. *Id.* Then, in the May 21, 2024 letter, J&J referenced the audit guidelines, the good faith period, and a general need to protect against duplicate discounts and diversion, Ex. 1, but rather than constituting "notice in writing," the May 21 letter remained ambiguous. 61 Fed. Reg. 65,410.  Not once did J&J actually notify OHSU that it believed OHSU had violated the provisions of Section 340B. *See generally* Ex. 1.

     As indicated by J&J's auditor, Deloitte & Touche LLP, HRSA granted J&J approval to audit OHSU on June 19, 2024—which importantly is less than 30 days from J&J's email dated May 21, 2024. ECF No. 1-2 at 1. Thus, J&J never provided any notice to OHSU of potential violations—regardless of whether they were alleged duplicate discount violations, diversion violations, or sham violations not mentioned in the 340B statute—before HRSA approved J&J's audit. *See* ECF No. 1-8 (HRSA email dated July 10, 2024, admitting it approved the audit of OHSU). This also means that OHSU and J&J never engaged in the thirty-day good faith period to attempt to resolve any perceived duplicate discount or diversion violations. *See* 61 Fed. Reg. at 65,410. Said more plainly, there was never any specific allegation (written or otherwise) of noncompliance with the 340B Program's prohibition against diversion or duplicate discounts, nor was there any notification that any reasonable person could have interpreted to initiate the requisite thirty-day resolution period as required by the Secretary's own procedures.

    **C.**     **HRSA's actions during the pendency of this litigation**

     After filing this action, OHSU requested that HRSA refrain from removing it from the 340B Program or taking similar enforcement actions while this lawsuit was pending. ECF No. 16-1. HRSA confirmed receipt of OHSU's request the same day yet said nothing about possibly

terminating OHSU from the 340B Program; instead, HRSA waited more than three months to send OHSU a substantive letter, in which it demanded that OHSU provide a start date for the audit by November 26 or otherwise face potential termination from the 340B Program. ECF No. 16-5. HRSA's less than forthright actions required OHSU to file a motion seeking a temporary restraining order, which HRSA initially opposed, but then the agency stipulated to refraining from taking any action involving OHSU's status in the 340B Program until January 1, 2025, at the earliest. ECF No. 17 at 2.

HRSA then filed the instant motion to dismiss on December 3, 2024. ECF No. 18. For the reasons that follow, OHSU opposes HRSA's motion and requests that the Court deny it in its entirety.

## III.    Legal standards

### A.    Federal Rules of Civil Procedure Rule 12(b)(1) and 12(b)(6)

Defendants moving for dismissal under Rule 12(b)(1) challenge whether subject matter jurisdiction exists. *Hall v. Sebelius*, 689 F. Supp. 2d 10, 16 (D.D.C. 2009). The party asserting subject matter jurisdiction bears the burden of demonstrating that it exists. *Id.* (citing *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008)).

Under Rule 12(b)(6), the defendant challenges the adequacy of the allegations in the complaint, specifically whether it "contains a short and plain statement of the claim showing that the pleader is entitled to relief" and gives fair notice to the defendant. *Hall*, 689 F. Supp. 2d at 16–17 (citing *Ciralsky v. CIA*, 355 F.3d 661, 668–70 (D.C. Cir. 2004) & Fed. R. Civ. P. 8(a)). For 12(b)(1) motions and 12(b)(6) motions, the Court must treat as true the complaint's factual allegations as well as mixed questions of law and fact. *Hall*, 689 F. Supp. 2d at 17 (citing *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003)).

## IV.    Argument

### A.    HRSA's decision to permit J&J to audit OHSU is a final agency action subject to review

The APA allows federal courts to review final agency actions and set them aside if they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704 & 706. In general, an agency decision is "final" when (1) the decision is a "consummation" of the decision-making process rather than a tentative or interlocutory decision and (2) the action is one that determines "rights or obligations" or causes "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The Supreme Court has instructed lower courts "to apply the finality requirement in a 'flexible' and 'pragmatic' way." *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435 (D.C. Cir. 1986) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149–50 (1967)). Accordingly, courts must look to whether the agency's position is "definitive" and immediately affects business operations of the challenging party: "[o]nce the agency publicly articulates an unequivocal position … and expects regulated entities to alter their primary conduct to conform to that position," the agency's decision is final and subject to judicial review. *Ciba-Geigy*, 801 F.2d at 436 (citations omitted).

### 1.    HRSA's approval of the audit was a definitive position

The *Ciba-Geigy* case involving labeling issues for a pesticide is instructive here. At the district court level, the court determined that EPA had not taken a final action because it had threatened to institute a misbranding enforcement action against the plaintiff's product, but it had not yet instituted the enforcement action. 801 F.2d at 435, 433. However, the D.C. Circuit found that the district court had misconstrued the plaintiff's action; the plaintiff had not challenged the sufficiency of a misbranding case against it, but "raised instead a pure legal question as to what procedures EPA was obliged to follow before requiring a labeling change." *Id.* at 435. Thus, the

pertinent question was whether the plaintiff had a right to a cancellation hearing before it was required to change its label, rather than whether the plaintiff had violated the EPA's labeling requirements. *Id.* As to "definitiveness," the EPA's letter was unequivocal on whether a cancellation hearing was required, gave no indication that EPA's position "was subject to further agency consideration or possible modification," and demanded the plaintiff's "immediate compliance." *Id.* at 436–37. As for the effect on business operations, the EPA's position was one of a series of steps that "had the practical effect of imposing labeling changes on [plaintiff] without affording it a hearing." *Id.* at 436 n.8. Therefore, the agency's decision was final and reviewable.

In this case, like in *Ciba-Geigy*, OHSU is not challenging at this time the factual basis of J&J's audit request; rather, it is challenging whether required procedures were followed that would have enabled HRSA to authorize the audit in the first place. Similarly, like in *Ciba-Geigy*, HRSA's letter to OHSU dated July 10, 2024, was unequivocal and affirmatively stated that HRSA would not reconsider its decision to approve J&J's audit: "HRSA declines to reconsider its prior determination that J&J may conduct this audit pursuant to section 340B(a)(5)(A) of the Public Health Service Act." ECF No. 1-8. HRSA doubled down on the definitiveness of its position during the pendency of this lawsuit: "To the extent that [OHSU] inhibits the audit from proceeding, HRSA reserves the right to remove [OHSU] from the 340B Program …. Please notify HRSA no later than November 26, 2024, of the date by which the audit will begin." ECF No. 16-5. The "definitive" prong is therefore met. *See Ciba-Geigy,* 801 F.2d at 436–37; *see also Sanofi-Aventis U.S., LLC v. HHS*, 570 F. Supp. 3d 129, 190 (D.N.J. 2021) (holding that violation letters from HHS that threatened to impose civil money penalties were final agency decisions regardless of whether they "could be construed as pre-enforcement proceedings or actual enforcement" because nothing in HHS's letters indicated the statements and conclusions were open to further

consideration) *rev'd in part on other grounds by* 58 F.4th 696 (3d Cir. 2023); *City of Dania Beach v. FAA*, 485 F.3d 1181, 1184, 1188 (D.C. Cir. 2007) (holding that an FAA letter was a final agency decision, despite FAA's claim that the letter merely "explain[ed] the existing procedures … in which [] runways would be used," because nothing in the letters indicated that FAA's statements were "tentative, open to further consideration, or conditional"); *Bimini Superfast Operations LLC v. Winkowski*, 994 F. Supp. 2d 106, 117 (D.D.C. 2014) (holding that a CBP letter that informed plaintiff that its cruise business violated immigration law met the definitiveness prong despite CBP arguing that administrative and enforcement actions could be brought subsequent to the letter, because there was "no indication that any such enforcement process would change CBP's legal position . . . given the purely legal nature of [it].").

### 2. HRSA's audit approval effectively determined "rights or obligations" and caused "legal consequences" for OHSU

As for the effect on OHSU's day-to-day business, it is immediate and tangible. To comply with the audit, OHSU would have to (and in reality has already had to) divert resources, specifically employees, away from their usual duties and responsibilities to respond to J&J's audit requests. For example, OHSU would have to engage to further limit the scope of the requests, as the initial Document Request List already provided to OHSU exceeds the scope of current formal 340B Program audits conducted by the agency itself, but there is no guarantee that J&J would agree to narrow the scope. In addition, OHSU would have to attempt to negotiate a confidentiality agreement, with no guarantee of materially protective terms applicable to its confidential or strategic business information. And even with a carefully crafted confidentiality agreement, there is no meaningful ability for OHSU to limit J&J's use and application of its knowledge of OHSU's business practices to institute additional audits against OHSU in the future or otherwise adversely impact OHSU's business interests given J&J's  status as a private, for-profit third party rather than

a government agency performing an investigation. *See, e.g.*, *Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010) ("This Court has recognized that the disclosure of confidential information can constitute irreparable harm because such information, once disclosed, loses its confidential nature."); *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d. 67, 77–78 (D.D.C. 2001) (finding that the disclosure of customer information would be harmful to the plaintiff and the loss of customer trust and goodwill due to that disclosure would exacerbate the harm); *Council on Am.-Islamic Rels. v. Gaubatz*, 667 F. Supp. 2d 67, 75–77 (D.D.C. 2009) (issuing temporary restraining order to prevent irreparable harm to plaintiff by the further disclosure of its proprietary, confidential, and privileged information); *Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419, 432 (D.D.C. 2018) (noting that the disclosure and use of confidential information by a third party is hard to quantify and cannot be cured through money damages).

This is not speculation or paranoia; J&J has revealed its intent to undermine and diminish the 340B Program any way it can. *See, e.g.*, *Johnson & Johnson Health Care Systems, Inc. v. Becerra*, No. 1:24-cv-3188 (D.D.C. Nov. 12, 2024) (ECF No. 1) (challenging HRSA's refusal to permit J&J to unilaterally administer the 340B discount through a *post-hoc* rebate program and claiming without support that the 340B Program "primarily benefits sophisticated, well-resourced hospital systems" and that "program abuse has [] become rampant"). By requiring OHSU to alter its conduct and conform with HRSA's position—that is, to comply with the improperly-initiated audit or risk being terminated from the 340B Program—HRSA has rendered its decision final and subject to review. *See Ciba-Geigy*, 801 F.2d at 436.

### 3.    HRSA's arguments to the contrary are unavailing

HRSA tries to make light of OHSU's confidentiality concerns, arguing that in reviewing J&J's audit work plan and allowing the audit to proceed, HRSA "was satisfied that the audit

workplan had sufficient procedures 'to protect patient confidentiality and proprietary information.'" ECF No. 18 at 14. With all due respect, that is easy for HRSA to say when it is not HRSA's proprietary or confidential business information at issue. As anyone who has litigated knows—which includes HRSA's DOJ counsel—no confidentiality provisions or protective orders are perfect. And even then, noncompliance with such provisions or orders would require OHSU to initiate an enforcement action against the 39th largest company *in the world* with over 130,000 employees. *See, e.g.*, https://www.jnj.com/our-company (last accessed December 8, 2024). The only surefire way to protect confidential information from being misused or disclosed to the public is to keep it under lock and key. *See, e.g.*, *In re Independent Serv. Orgs. Antitrust Litig.*, 162 F.R.D. 355, 357–58 (D. Kan. 1995) (acknowledging that production of documents "under the present protective order[] might be harmful," even where the opposing party had previously complied with a protective order, because the inadvertent disclosure of information could harm the producing party); *FTC v. Sysco Corp.*, 83 F. Supp. 3d 1, 4–5 (D.D.C. 2015) (revising protective order to require in-house counsel to review certain documents in a secure data room or document review platform to protect against inadvertent disclosure).

Because J&J is obsessed with trying to demonstrate failure by 340B covered entities to comply with what it believes the 340B Program should be and not what is required by law, OHSU takes little solace that HRSA was "satisfied" that "sufficient procedures" were in place—especially when it is already clear that HRSA approved J&J's audit work plan without following the Manufacturer Audit Guidelines. Since HRSA gave short shrift to its notice and good faith requirements, it is just as likely that HRSA shirked its responsibility to ensure that the audit plan would adequately protect OHSU's proprietary and confidential business information.

HRSA also argues that its decision to approve an audit is not final, because the audit could later result in HRSA taking enforcement actions against OHSU, or J&J could elect to use the audit findings to bring an administrative dispute resolution action against OHSU. ECF No. 18 at 10–11. But this is not the first time HRSA has been confused about whether its Manufacturer Audit Guidelines, in isolation and irrespective of any audit, are a final agency action. In *Genesis Healthcare, Inc. v. Becerra*, Genesis challenged HRSA's decision to remove it from the 340B Program following an audit. 39 F.4th 253, 256 (4th Cir. 2022). While the lawsuit was pending, HRSA vacated its order removing Genesis from the program. *Id.* In light of this action, HRSA moved to dismiss and convinced the district court that Genesis was challenging a non-final audit process rather than a final agency decision that resulted from the audit. *Id.* at 261.

The Fourth Circuit disagreed. Although it first found that the termination of Genesis from the program was a final agency action, it also noted that Genesis's "challenge to the 1996 Guidelines was also likely a challenge to a final agency action." *Id.* at 262 (citing *U.S. Army Corp. Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599–600 (2016)) (holding that affirmative jurisdictional determinations, which are findings that private properties contain "waters of the United States," are final agency actions because the property owners could be subject to later administrative or criminal proceedings if they discharge pollutants onto their properties without obtaining a permit from the Corps). The Fourth Circuit's rationale in *Genesis* was based on the Supreme Court's guidance to take a "pragmatic approach" to finality, and Genesis had standing to challenge the Guidelines because it had suffered an adverse effect.

So too does OHSU have standing in this case. HRSA ignored its Guidelines when it approved J&J's audit, and as discussed above, the audit will have damaging effects on OHSU regardless of the outcome of any audit. Thus, OHSU is challenging HRSA's failure to follow its

Guidelines—not whether HRSA has authority to impose sanctions based on the outcome of an audit. That harm and legal consequence cannot be reviewed or remedied at a later time. OHSU's options were to (1) challenge HRSA's decision now, (2) comply with the audit, or (3) do nothing and risk expulsion from the 340B Program. The only palatable option was to file this lawsuit.

Finally, HRSA cites two cases involving audits in support of its argument that its approval of the J&J audit was not a final agency action. ECF No. 18 at 11. The first opinion, *Benefitalign, LLC v. CMS*, Civ. A. No. 24-2429 (JEB) (D.D.C. Sept. 30, 2024) (ECF No. 17), available on PACER but not Westlaw, is short and omits context, but the plaintiff was challenging its suspension from the Affordable Care Act marketplace while a CMS audit and final decision were pending. *Id.* at 2. Unlike OHSU in this case, the plaintiff was not challenging whether the agency had correctly followed its rules before imposing the suspension and conducting an audit, which is a purely legal question. The same is true of HRSA's other case, *Massachusetts Manufacturing Extension Partnership v. Locke*, 723 F. Supp. 2d 27 (D.D.C. 2010), except the plaintiff was not even challenging an audit in that case; rather, it challenged general terms and conditions that were no longer in effect, prompting the court to find the claim moot and remark in passing that ongoing audits, which may be impacted by the new terms and conditions, were subject to further agency review and were not final. *Id.* at 37–38. Again, HRSA misconstrues the claim at issue here: OHSU is presenting a purely legal question as to whether HRSA followed the Guidelines when it approved J&J's audit—not whether HRSA can approve an audit or whether any preliminary results are subject to review.

### 4. The HIPAA Privacy Rule further demonstrates that HRSA's audit approval is a final agency action that has legal consequences for OHSU

In addition to the above reasons for why HRSA's audit approval is a final agency action, HRSA's counter position is in clear tension with the practical and legal effect of its approval. The

information requested by J&J's auditor, Deloitte, includes patients' protected health information ("PHI"), such as their medical record number and even screenshots of their medical records. ECF No. 1-3 at 3–4. Under the HIPAA Privacy Rule, a covered entity is prohibited from disclosing patients' PHI unless the disclosure meets a regulatory exception. One such exception exists for disclosures required by law. 45 C.F.R. § 164.512(a)(1). Another exists for the health care provider's treatment, payment, and operations purposes. 45 C.F.R. § 164.506(c).

Other than through a properly approved manufacturer audit, it is unclear whether a covered entity may disclose patients' PHI to a manufacturer or its agent without the patient's consent; the exception for a health care provider's payment purposes does not clearly apply to transactions between the provider and its upstream suppliers like drug manufacturers. HHS must now make a choice: either HRSA's approval of J&J's audit request has real legal consequences for OHSU such that the disclosure of PHI is "required by law"—which would indicate under the second *Bennett* factor that HRSA's approval is a final agency action—or its approval was immaterial, and entities like OHSU would violate HIPAA were they to provide PHI to manufacturers, unless some other HIPAA regulatory exception applies.

**B. Even if HRSA's approval of the audit is not a final agency decision, it is ripe for review because OHSU will be immediately harmed and will suffer legal consequences as a result of HRSA's failure to follow its Guidelines**

The ripeness doctrine involving agency decisions stems from the Supreme Court's decision in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967). The Court's rationale was to "protect the agencies from judicial interference until an administrative decision ha[d] been formalized and its effects felt in a concrete way by the challenging parties." *Id.* To that end, the Court set forth two factors: (1) the fitness of the issues for judicial decision and (2) the hardship to the parties were the Court not to intervene and review. *Id.* at 149. Under the Court's logic, the first

prong is generally met when the question is purely a legal one and the agency's decision is a final agency action. *Id.* As to the second prong, parties can establish hardship by showing that absent immediate compliance with the agency's position, the challenging party risks an enforcement action by the government. *Id.* at 152.

The D.C. Circuit has applied these principles many times, including in an en banc decision, *Cont'l Air Lines, Inc. v. C.A.B.*, 522 F.2d 107, 124 (D.C. Cir. 1975) (en banc). Under the ripeness doctrine, agency decisions are reviewable regardless of the label the agency attaches to its action and regardless of whether the action has "any formal, legal effect." *Id.* at 124. Indeed, "[a]gency positions are never absolutely final." *Id.* at 128. Instead, courts must pragmatically balance the finality of the agency's position—which exists if the agency's decision is unlikely "to be abandoned or modified before it is actually put into effect"—against the "immediate and practical impact" upon the party seeking judicial review. *Id.* at 125. In close cases of ripeness, there is a "presumption of reviewability," especially when the affected entity must choose between disadvantageous compliance or the imposition of serious penalties. *Id.* at 128.

Most importantly, however, although ripeness and finality sometimes overlap, they are distinct concepts. *Global Tower Assets, LLC v. Town of Rome*, 810 F.3d 77, 87 n.4 (1st Cir. 2016). Thus, an agency action may be ripe for judicial review even if it is not final. *Id.* This most often happens when a party would have to risk triggering an enforcement action before it could seek judicial review. *Unity08 v. F.E.C.*, 596 F.3d 861, 865 (D.C. Cir. 2010) ("Ordinarily, a claim that a challenge to an agency's final legal position must await an enforcement proceeding is analyzed under the ripeness doctrine's requirements that issues be fit for review and (in some cases) that deferral of review would pose significant hardship on the complaining part.").

In this case, both ripeness doctrine factors favor judicial review, so OHSU has no need to resort to the presumption of reviewability. As to finality, as noted above, HRSA's decision to authorize J&J's audit is a final agency action. OHSU already requested reconsideration, and HRSA explicitly declined. ECF No. 1-8. HRSA then reemphasized the finality of its decision by threatening sanctions should OHSU not comply with the audit: "To the extent that [OHSU] inhibits the audit from proceeding, HRSA reserves the right to remove [OHSU] from the 340B Program …. Please notify HRSA no later than November 26, 2024, of the date by which the audit will begin." ECF No. 16-5. It is difficult to fathom a more definitive or unequivocal agency position.

Nonetheless, HRSA claims that its approval of the audit is just a "first step in the process to determine whether … [to] take enforcement action against OHSU," and that OHSU could contest the audit findings, but HRSA's argument focuses on the wrong inquiry. Like in *Ciba-Geigy*, OHSU is not challenging the appropriateness of the audit or any conclusion that it engaged in sanctionable conduct. Rather, OHSU is challenging whether HRSA should have approved the audit in the first place, because it failed to follow its own written Guidelines (*i.e.*, procedures) for approving an audit. The audit has not started and HRSA plays no role in the audit process until it is finished. To wit, when OHSU asked HRSA to extend the unreasonably short response deadline imposed by J&J's auditor, HRSA said that it was up to J&J to grant the extension. ECF No. 1-8 ("If [OHSU] determines that it needs additional time to review J&J's data request and gather the necessary documents, it should ask J&J for an extension."). HRSA's claim that judicial review would "entangle" the Court in "abstract disagreements over administrative policies," "impede [the] administrative process," or "inappropriately interfere with further administrative action," see ECF No. 18 at 6–7, rings hollow. Likewise, HRSA's claim that the "Court would benefit from further factual development of the issues presented in this case," *id.* at 8, makes no sense. The record

regarding this case is complete and there are no more facts to develop. OHSU is challenging whether HRSA followed the appropriate procedures to approve an audit, not the results of any audit. There is no time but now to assert that claim—it becomes moot if OHSU cooperates with the audit in any capacity. And the Court needs no further "factual development" to realize that HRSA failed to comply with its own Guidelines.

In addition to *Ciba-Geigy*, this case is analogous to the situation in *Hearth, Patio & Barbecue Assoc. v. EPA*, 11 F.4th 791 (D.C. Cir. 2021). In *Hearth*, EPA argued that the plaintiff's challenge to its audit provisions was unripe, because EPA had not yet audited any devices under the provisions and any future negative audit findings were speculative. *Id.* at 804. But the D.C. Circuit disagreed, finding that EPA characterized the petition too narrowly. *Id.* Rather than challenge the audit provisions or a future audit, the plaintiff challenged whether EPA could dictate where the audit would occur—a procedural question that was purely legal in nature. *Id.* Consequently, the D.C. Circuit found the issue ripe for review. *Id.* The same is true here. The claim at issue is purely legal, challenging whether HRSA followed the proper procedures—its own written Guidelines—before it approved J&J's audit. Here and now is the only time to review that decision; otherwise, the audit proceeds and OHSU loses its chance to challenge the improper initiation of the audit—or worse, OHSU refuses to comply and suffers termination from the 340B Program.

For all these reasons, OHSU's challenge to HRSA's failure to follow its Guidelines is fit for review. *See Maryland Dep't of Human Res. v. Sullivan*, 738 F. Supp. 555, 561–62 (D.D.C. 1990) (holding that while "[l]ack of final agency action typically renders a claim unripe for review," purely legal questions can be ripe for review despite no final agency decision); *Sheridan Corp. v. United States*, 95 Fed. Cl. 141, 150 (Fed. Cl. 2010) (finding issue ripe for review despite

not being a final decision because plaintiff challenged "the agency's rationale for its decision to take corrective action in the first place" rather than the results of the corrective action); *F.L. v. Thompson*, 293 F. Supp. 2d 86, 92–93 (D.D.C. 2003) (finding plaintiff's challenge as to which agency could decide consent decisions for him to be ripe despite the government not making a final decision); *HRI, Inc. v. EPA*, 198 F.3d 1224, 1238 n.7 (10th Cir. 2000) (holding letter from EPA was sufficiently ripe for review despite EPA providing two alternative positions and later retreating from its definitive assertion of jurisdiction); *Seminole Nation of Okla. v. Norton*, 223 F. Supp. 2d 122, 142–43 (D.D.C. 2002) (holding that Department of the Interior letter was ripe for judicial review even though it was not a final agency decision).

Because the issue is fit for review, the required hardship that OHSU must show is diminished or not required at all. *See, e.g.*, *Consolidated Rail Corp. v. United States*, 896 F.2d 574, 577–78 (D.C. Cir. 1990) ("In light of our conclusion that this matter is clearly fit to be heard, we need not even consider whether petitioners would suffer any hardship from our postponing its resolution …."); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 465 (D.C. Cir. 2006) (same); *A.L. Labs., Inc. v. EPA*, 674 F. Supp. 894, 898 (D.D.C. 1987) (holding that the required showing of hardship diminishes as the strength of the first prong of *Abbott Laboratories* increases).

Nevertheless, the hardship would be substantial without judicial intervention, because OHSU would have to choose between complying with HRSA's position—and thus subject itself to an overly broad audit and reveal its confidential business information to a third party—or risking the prospect of sanctions or removal from the 340B Program altogether. That is, OHSU faces the quintessential hardship if this Court decides not to intervene. *See Abbott*, 387 U.S. at 152; *Cont'l Air Lines*, 522 F.2d at 128. Termination from the 340B Program would immediately cost OHSU

millions of dollars per month in lost savings. And if OHSU did comply with the audit to avoid termination, it would be forced to disclose confidential business documents well before it had any chance to dispute the audit findings. In short, this Hobson's choice would harm OHSU, and the only way to prevent the harm is immediate judicial review.

### C.     J&J did not follow the Manufacturer Audit Guidelines before HRSA approved its audit, contrary to HRSA's misguided arguments

#### 1.     HRSA's Manufacturer Audit Guidelines are binding, which HRSA does not contest

When HRSA proposed the Manufacturer Audit Guidelines in the Federal Register, following the customary notice and comment process, and then published the final version in the Federal Register, HRSA made the Guidelines binding on entities that participate in the 340B Program—both manufacturers and covered entities. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 683 (2020) (a document published in the Federal Register is binding if it "contain[s] all of the elements of a notice of proposed rulemaking as required by the APA."). Specifically, in 1994, the Secretary published a Notice with proposed Guidelines and collected public comments on them. 59 Fed. Reg. 30,021 (June 10, 1994). In 1996, the Secretary responded to comments and published the Guidelines in a Final Notice. 61 Fed. Reg. at 65,406. In both documents, he invoked section (a)(5)(C) and provided not just a summary, but a full copy of the Guidelines in proposed and then final form. These publications are "sufficient to give notice of the contents of the document to a person subject to or affected by it." 44 U.S.C. § 1507. Indeed, in its motion, HRSA concedes the guidelines are binding. *See* ECF No. 18 at 2–3.

#### 2.     HRSA approved J&J's audit despite J&J failing to provide notice and failing to engage in a 30-day good faith period to resolve any issues with OHSU

Here, HRSA's audit guidelines are clear and unambiguous: a manufacturer that suspects a covered entity committed a violation "***shall*** notify the covered entity in writing when it believes

the covered entity has violated provisions of section 340B." 61 Fed. Reg. at 65,410 (emphasis added). After receiving such notice, the "manufacturer and the covered entity **shall** have at least 30 days from the date of notification to attempt in good faith to resolve the matter." *Id.* (emphasis added). If, and only if, "the matter is not resolved and the manufacturer desires to perform an audit, [then] the manufacturer **must** file an audit work plan" with HRSA. *Id.* (emphasis added). In the audit work plan, the manufacturer "must set forth a clear description of why it has reasonable cause to believe that a violation of [duplicate discounts or diversion] has occurred, along with sufficient facts and evidence in support of the belief." *Id.* Only after reviewing the audit work plan may HRSA decide to permit the audit to proceed by declining to intervene. *Id.* Because the thirty-day good faith period is mandatory, HRSA determined at the time it issued the Guidelines that it is not necessary for a covered entity to review and comment on a proposed audit work plan before HRSA approves it. *Id.* at 65,408.

Yet here, OHSU never received written notice of any potential violations from J&J. ECF No. 1-8. When J&J first contacted OHSU on April 22, 2024, J&J's employee stated they were "reaching out …. to discuss and ask questions regarding your entity's 340B utilization." ECF No. 1-1 at 1. OHSU promptly responded and proposed some possible times to meet and discuss the matter. *Id.* The planned meeting on May 3, 2024 never occurred because one of J&J's necessary attendees was unavailable at that time. *Id.* at 2–3. On May 15, 2024, J&J sent a new request to meet with OHSU in order to have "a good faith discussion on the growth in [OHSU's] 340B utilization." *Id.* at 3. In response to that request, OHSU's Chief Operating Officer Joe Ness stated that the communications with J&J had been "nonspecific regarding the basis for the inquiry" and OHSU needed "additional information regarding the basis for [the] inquiry" to ensure an "adequate

response." *Id*. at 5. He also highlighted OHSU's commitment to complying with 340B Program obligations and emphasized the importance of ensuring regulatory compliance. *Id.* at 6.

At no point in its communications did J&J notify OHSU that it believed OHSU was violating provisions of section 340B. *See* 61 Fed. Reg. 65,410. In all of the communications that occurred before May 21, 2024, J&J never used the word "violation" or a synonym of that word. Similarly, J&J never used the words "diversion" or "duplicate discounts," or any replacements for those words, in its communications with OHSU. In the May 21, 2024 email, J&J referenced the audit guidelines, the good faith period, and a general need to protect against duplicate discounts and diversion, but it did not explicitly or implicitly notify OHSU that it believed OHSU had violated the provisions of Section 340B. *See generally* Ex. 1; *see also* 61 Fed. Reg. at 65,410 (requiring a manufacturer to notify a covered entity in writing "when it believes the covered entity has violated the provisions of section 340B"). Hence, J&J did not provide notice of any alleged violations to OHSU, and OHSU and J&J never engaged in a thirty-day good faith period. Yet HRSA granted J&J approval to audit OHSU on June 19, 2024. ECF No. 1-2 at 1. Even if J&J's May 21, 2024 email constituted notice, it occurred less than thirty days before HRSA approved J&J's audit.

Despite the opacity of J&J's communications and its failure to alert OHSU that it believed OHSU had violated diversion or duplicate discount prohibitions as required by the Guidelines, HRSA argues that J&J complied with the Manufacturer Audit Guidelines by providing notice to OHSU. ECF No. 18 at 13–14. To fabricate this argument, HRSA suggests that the Guidelines do "not mandate that the notice have a specific form or contain specific content," and HRSA submits that J&J's "concerns" about "growth" and "utilization" somehow put OHSU "on notice that [J&J]

suspected that [OHSU] was misusing the program and that [J&J] was attempting 'in good faith to resolve the matter.'" *Id.* at 14 (citing 61 Fed. Reg. 65,410).

HRSA's position ignores the explicit language of the Manufacturer Audit Guidelines, as well as common sense. Manufacturer audits "must pertain directly to the entity's compliance with the prohibitions against drug diversion and the generation of duplicate drug rebates and discounts…." 61 Fed. Reg. 65,406. Before a manufacturer can initiate an audit, the "manufacturer shall notify the covered entity in writing when it believes the covered entity has violated provisions of section 340B." 61 Fed. Reg. 65,410. Thus, the Guidelines demand written notification of potential violations—specifically of duplicate discounts or diversion—not ambiguous assertions about "utilization," "growth," and "concerns." Indeed, despite arguing that OHSU was put on notice, HRSA never identifies which of J&J's vague communications was sufficient to meet the Guidelines' standard. Instead, it appears to expect that OHSU should deduce J&J's intent by amalgamating messages that it sent on April 22, May 15, and May 21 and then fill in the gaps. This would turn the Guidelines' clear "written notice" standard into an exercise in high-stakes wordplay. But as HRSA knows, words matter, especially when they may trigger legal consequences. *See, e.g.*, *Loma Linda Univ. v. Sebelius*, 684 F. Supp. 2d 42, 52–54 (D.D.C. 2010) (holding that HHS bulletins did not provide notice of billing deadlines, because "there is no language in any of those documents regarding time limits, nor is there any mention of … the regulation governing deadlines," and finding HHS's position that the plaintiff should have "inferred earlier" that regulatory deadlines applied to be "arbitrary and capricious" and "unsupported by substantial evidence") *aff'd* 408 F. App'x 383 (D.C. Cir. Dec. 2, 2010). J&J could have simply followed the Guidelines and made a clear, unequivocal statement that it believed OHSU had violated the provisions of Section 340B. Instead, it used vague statements to convince

HRSA to allow a fishing expedition, which the agency suggests should continue. The time for correcting that error, however, has passed.

After providing notice, under the Guidelines, the manufacturer must "attempt in good faith to resolve the matter" with the covered entity for thirty days from the date of notification. 61 Fed. Reg. 65,410. This period never occurred, even if the May 21, 2024 email constituted notice, because HRSA approved the audit on June 19, 2024. For HRSA to argue otherwise in its motion ignores the record as it currently exists.[3]

In short, HRSA ignored its own binding procedures and departed from "reasoned decision making" when it approved J&J's audit. *See Cont'l Res., Inc. v. Gould*, 410 F. Supp. 3d 30, 36–37 (D.D.C. 2019) (reversing agency decision that was "plainly erroneous [and] inconsistent with the regulation" and departed from "reasoned decision making"). HRSA's arguments to the contrary— that J&J provided notice and engaged in a good faith effort under the Manufacturer Audit Guidelines—is at best a misrepresentation of the record.

## V. The Court should ignore J&J's amicus brief, because OHSU has clarified its communications with J&J through this brief, and the government has already presented J&J's legal position

In a motion for leave to file an amicus brief that OHSU opposes and HRSA does not endorse, J&J further reveals the lens through which it views the 340B Program. Mot. for Leave, ECF No. 20. Despite claiming to be a "proud participant in the 340B Program," J&J declares in its motion that the program no longer supports uninsured or indigent patients and is subject to "rampant abuse, to the detriment of patients." *Id.* at 1–2. Of course, J&J does not disclose what the

---

[3] HRSA has not yet had to file the full administrative record with the Court pursuant to Local Civil Rule 7(n), and OHSU has not received a copy of the administrative record. Nor has HRSA complied with Local Civil Rule 7(n)(1) to provide a certified list of the administrative record.

alleged detriment to patients is, nor does it support its contention that the 340B Program no longer helps uninsured or indigent patients.

In its proposed brief, after parroting the hyperbole in its motion for leave, J&J makes a number of misleading or inaccurate claims about the 340B Program and the law surrounding it. Rather than address every exaggerated claim, OHSU will rebut select issues here. For example, J&J submits that although disproportionate share hospitals (DSH) like OHSU "serve a number of low-income patients, they are typically large, sophisticated systems that can generate billions in revenue…." ECF No. 20-1 at 2–3. Even if this were true, revenue does not equate to profit and being large or sophisticated—two amorphous and subjective terms—does not reduce the cost of caring for low-income or indigent patients.

J&J also makes hay about DSH covered entities accounting for more than 78% of all purchases by 340B covered entities. *Id.* at 3–4. It is unclear why this is noteworthy. DSH covered entities are one of only a few categories of entities that are covered by the 340B Program, as noted by the *Novartis* case that J&J repeatedly cites. *See Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456 (D.C. Cir. 2024) ("the statute defines 'covered entity' to mean only healthcare providers that fit within narrow categories such as black lung clinics, rural referral centers, and hospitals that ***primarily*** serve low-income patients") (emphasis added) (citing 42 U.S.C. § 256b(a)(4)). If only narrow categories of providers are covered, some of which focus on discrete issues like black lung disease or service rural areas that by definition have small populations, the fact that DSH covered entities service a larger share of patients should not come as a surprise. Further, the same HRSA source cited by J&J shows that the top ten drugs purchased by 340B covered entities in 2023 were for specialty indications such as cancer, HIV, and cystic fibrosis. HRSA, *2023 340B Covered Entity Purchases*, https://www.hrsa.gov/opa/updates/2023-340b-covered-entity-purchases (last accessed

Dec. 17, 2024). It should not be surprising that when patients have serious diseases, they go to the hospital.

The real purpose behind J&J's pretextual motion is to further effectuate its desire to eliminate the use of contract pharmacies. ECF No. 20-1 at 4; *see also id.* at 5 (complaining about pharmacy "replenishment models"). But OHSU's lawsuit has nothing to do with contract pharmacies—rather, it presents a purely legal question challenging HRSA's decision not to follow its own Guidelines before approving an audit.

After reiterating the procedures under the Guidelines, which the parties have already done, J&J submits that the Guidelines are not authorized by the 340B statute, exceed HRSA's delegated authority, and thus are not binding. ECF No. 20-1 at 7–8. The Court should dismiss this argument without a second thought. As to the actual parties in this action, OHSU asserts that the Guidelines are binding, and HRSA has indicated the same by setting forth the legal requirements of the Guidelines in its Statutory and Regulatory Background section. *See supra* Section IV.C.1; ECF No. 16 at 6; ECF No. 18 at 2–4. As it happens, even J&J appeared to believe the Guidelines were binding when it claimed on May 21 to be "entitled to understand the drivers of growth in Oregon Health Science Center University Hospital's 340B utilization." Ex. 1 at 1 (relying solely on the Guidelines' preamble as support). In the present posture, J&J's expedient position is tangential to the parties' dispute and should be disregarded in its entirety.

As to J&J's actual discussion of the merits, J&J offers nothing to bolster HRSA's incorrect conclusion that its decision was not final. The first case J&J cites, *Bellion Spirits*, supports finality here because the agency letter in question imposed a "concrete legal effect" on the plaintiff, which the plaintiff could only challenge, without suffering harm, by filing an immediate lawsuit. *Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1209 (D.C. Cir. 2021). The same is true here: HRSA

approved the audit of OHSU without following its written procedures, the audit will negatively impact OHSU, HRSA declined to reconsider its decision, and OHSU's only window to challenge the propriety of the initiation of the audit is right now. For all these reasons and more, J&J's second case, *Sound Association v. FTC*, bears no relation to the matter at hand. *See* 888 F.3d 1261, 1268 (D.C. Cir. 2018) (holding that an informal letter by a subordinate "staff" official, which could be rescinded at any time, was not binding on the Commission, and could be reviewed by the Commission at plaintiff's request, was not a final agency decision).

J&J also provides a near verbatim recitation of its pre-audit-request communications with OHSU. ECF No. 20-1 at 10–13. All that does is confirm that J&J never notified OHSU "in writing when it believe[d] [OHSU had] violated provisions of section 340B." *See* 61 Fed. Reg. at 65,410. Specifically, it was not until May 21, 2024 that J&J mentioned an audit and used the words diversion and duplicate discounts, but even then it avoided providing explicit notice to OHSU of any alleged violations. *See generally* Ex. 1. OHSU explained above why this email was omitted from the Complaint, see supra section II.B, and regardless, if the May 21 email constituted notice, it was only ten days before J&J asked HRSA to approve an audit, ECF No. 20-1 at 12, and less than thirty days before HRSA approved the audit on June 19, 2024. ECF No. 1-2 at 1. Accordingly, no thirty-day good faith period transpired.

Finally, in a misguided attempt to bolster HRSA's argument that J&J did provide notice, J&J likewise speciously argues that raising concerns about growth and utilization were adequate to make "OHSU aware that J&J suspected possible compliance issues and sought to resolve that matter in good faith…." ECF 20-1 at 13. The Guidelines, however, do not impose a burden on a covered entity to divine the intention of a drug manufacturer. Instead, the burden is on a manufacturer who wants to conduct an audit to notify a covered entity, ***in writing***, "when [the

manufacturer] believes the covered entity has violated provisions of section 340B." 61 Fed. Reg. 65,410. These requirements are reasonable and in fact necessary to ensure the proper functioning of our healthcare delivery system. There is no doubt that all 340B participating drug manufacturers would like to obtain the confidential business information of covered entities by merely alleging non-specific concerns as was done here, but when the purpose of the 340B Program was to protect covered entities against manufacturer price increases H.R. Rep. No. 102-384, pt. 2, at 11 (1992), that was clearly not Congress's intent.

Indeed, if J&J truly wanted to convey its suspicions and engage with OHSU on the substance of those suspicions, why dance around the issue with vague words about concerns, growth, and utilization? Why not just state that J&J suspected OHSU of diversion or duplicate discounts? And why not acknowledge—to OHSU or before this Court—its own role in depressing 340B utilization and implementing other changes that very likely resulted in a temporary slowdown of 340B purchases—*i.e.*, the very "increase" or "growth" that causes concerns for J&J?[4] The likely answer is that J&J sought to provide pretextual "notice" without actually engaging in good faith consistent with what the 340B statute and Guidelines require. That is precisely why OHSU needs HRSA to follow its procedural guidelines before approving audits, and why OHSU now needs the Court to revoke HRSA's approval.

## VI.    Conclusion

OHSU's only chance to stop J&J's inappropriately approved audit from proceeding is right now, through judicial intervention. Without court involvement, OHSU must either risk termination

---

[4] Since 2022, J&J has refused to ship most of its drugs to hospital covered entities' contract pharmacies. *See* Johnson & Johnson*, Notice to 340B and Non-340B End Customers Regarding Updates to 340B Delivery Limitations* (https://www.amerisourcebergen.com/-/media/assets/amerisourcebergen/340b/manf-letters/jjhcs-letter-021523.pdf) (last accessed Dec. 17, 2024).

from the 340B Program or provide confidential business documents to a drug manufacturer that is resolved to undermine the entire purpose of the 340B statute. Therefore, HRSA's failure to follow its Guidelines when it approved the audit is a final agency action that is ripe for review. As a result, the Court should deny the motion to dismiss filed by Carole Johnson in her official capacity as Administrator, Health Resources and Services Administration.

Respectfully submitted,

By: */s James Junger*
Tyler James Junger
DC Bar Identification Number: WI0036
jjunger@hallrender.com
Todd A. Nova (pro hac vice)
tnova@hallrender.com
Hall, Render, Killian, Heath & Lyman, P.C.
330 East Kilbourn Avenue
Suite 1250
Milwaukee, WI 53202
(414) 721-0922

Brandon C. Helms (pro hac vice)
bhelms@hallrender.com
Hall, Render, Killian, Heath & Lyman, P.C.
101 W. Big Beaver Road, Suite 745
Troy, MI 48084
(248) 457-7847

*Attorneys for Plaintiff Oregon Health &
Science University*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on December 17, 2024 a true and correct copy of the foregoing

was served via the CM/ECF System to all parties of record.

By: <u>*/s  James Junger*</u>
Tyler James Junger
DC Bar Identification Number: WI0036
jjunger@hallrender.com